Duvale v. Duvale.

CHARLES L. DUVALE

v.

CELINE M. DUVALE.

1. When real estate is conveyed to a wife, but is paid for by her husband, a settlement and not a resulting trust will be presumed; but such presumption is rebuttable.

2. A promise to devise property, made for valuable consideration, will be enforced; and if the promisor attempts to violate his promise during his life, equity will at once, upon the principle of *quia timet.* impress upon the property a liability to answer the promise.

On final hearing.

*Mr. Henry S. Terhune, Mr. Charles H. Ivins* and *Mr. Charles L. Corbin,* for the complainant.

*Mr. William B. Guild, Mr. R. Wayne Parker* and *Mr. Cortlandt Parker,* for the defendant.

REED, V. C.

This bill is filed by a husband against his wife. The subject-matter of the suit concerns a house and its curtilage, situated at the Atlantic Highlands, New Jersey, the legal title to which is in the wife. The land was purchased and improved, and the buildings upon it were erected with the money of the husband. The prayer of the bill is that the wife may be declared to hold the said property in trust for her husband; or that she may be compelled to execute a will in his favor for it.

The admitted facts are these : On May 7th, 1890, the husband contracted with one Kay and one Cornwall to convey to him a lot of land for the sum of $3,000. On June 12th, 1890, a deed was made by Kay and Cornwall to the wife for said lot. The husband began the erection of a dwelling-house thereon, and also the general improvement of the property.

On September 9th, 1891, he purchased an adjoining lot from one Bernadou, for $1,000. On July 29th, 1892, he bought a

third tract adjoining the homestead tract, from one Swift, for the sum of $2,250. The titles of both these lots were taken in the name of the wife. In the purchase of these lots, in the erection of the dwelling-house and the stables thereon, and in the grading and terracing of the grounds, the husband has spent from $35,000 to $45,000.

Upon the bare facts so far disclosed, no trust in favor of the husband results. The fact that the grantee is the wife of the payer of the consideration, rebuts, *prima facie*, the presumption of a resulting trust in the payer, which trust would have arisen had the grantee been a stranger. The grantee being a wife, the presumption is that the property was put in her name as a settlement.

But the presumption that the deed was made by way of advancement or settlement, is a rebuttable presumption. Facts antecedent to or contemporaneous with the purchase, or so immediately following the purchase as to constitute a part of the same transaction, may be put in evidence for the purpose of refuting the presumption of a settlement. *Lew. Trusts marg. pp. 175, 177; Read* v. *Huff, 13 Stew. Eq. 229.* So, also, subsequent admissions by either husband or wife, against his or her own interests, are evidential for the same purpose. *Lew. Trusts marg. p. 177; Midmer* v. *Midmer's Executors, 12 C. E. Gr. 548.*

While the same kind of evidence which raises the presumption is admissible to overcome it, the circumstances in both instances must be so clear as to leave no reasonable doubt as to the intention of the parties. *Peer* v. *Peer, 3 Stock. 432, 439; Read* v. *Huff, supra.*

The testimony upon both branches of the complainant's insistence, viz., *first,* that there was a resulting trust, and *second,* that there was a promise to make a will for a consideration which has been performed, is so entangled that a single statement of the facts disclosed upon the hearing must include that which bears upon both points.

The testimony of the parties themselves upon the substantial points is entirely contradictory. The husband swears that he and his wife, previous to the execution of the deed for the first

lot, had been living for three consecutive summers at the Atlantic Highlands; that his wife, finding that the climate there suited her, urged him to buy a home at that place. Influenced by her request, he contracted in writing, in his own name, for the purchase of the first lot. Between the date of the making of the contract and the date of the execution of the deed for it, he had several conversations with his wife concerning the matter. In one or more of these she said to him:

"Look here, if you put that land in my name, it will prove to me that you are not going to run away with that woman you are keeping in New York, and it will make me happy."

Mr. Duvale says: "She told me that she would sign any paper I wanted her to sign to secure me; whenever I wanted she would deed it back to me." She said: "I will sign anything you want and whenever you want it." The allusion to the woman in New York, contained in the testimony, related to a Miss Hunter, with whom at one time the wife thought her husband had formed an illicit connection.

The deed for the property conveyed to the wife was drawn by Mr. Cannon, a lawyer of the State of New York. Mr. Duvale says that about the time the deed was made, perhaps a week later or a week earlier, he spoke to his wife about the execution of reciprocal wills in each other's favor. When recalled to the stand on a subsequent day, he, after talking with Mr. Cannon, said that the conversation occurred before the execution of the deed to his wife. It is conceded that two wills were drawn and executed—one from her to him, and the other from him to her—of all the property of each respectively. These wills were executed on August 26th, 1890. Then followed the purchase of the two adjoining lots, the title to which was put in the name of the wife.

In March, 1893, Mrs. Duvale left her husband's home at the Highlands. Mr. Duvale says that sometime during that month he saw her on the cars in Jersey City, a few days after she had left him, and she then told him that she had made a new will, and had given all her property to her relatives in France. She

Duvale *v.* Duvale.

had in fact made such a will, on March 15th, 1893. In reply to her information, he says he told her that she had a right to make all the wills she wished to, but, of course, she would give him back his property, and that she replied "Yes." Then she said, " but let me have it; I know that I have done wrong, and I will bring back that will and you can destroy it." Mr. Duvale refused to accede to her proposition.

In June, she returned to her home in the Highlands. Shortly before this she seems to have executed another will, drawn by Senator Applegate, in favor of her husband. This will was subsequently destroyed by Mrs. Duvale, in the summer or fall of 1893. This is a brief statement of the husband's account of the transaction.

Mrs. Duvale admits that they agreed to make reciprocal wills, but she denies that she ever heard anything about the making of these wills until shortly before their execution. She also denies having had any conversation with her husband previous to the time of the execution of the deed to her, in which conversation she promised to sign any paper in respect to the property in his favor.

The case, so far as it rests upon the testimony of the parties themselves, therefore stands thus: The husband swears that before the deed was made to his wife she promised to sign any paper to secure his title to it; that the wills were afterwards executed to effectuate that purpose, and that she destroyed the will in his favor and executed another to a new beneficiary. All the material parts of his testimony the wife denies.

Of the testimony of persons other than the parties, the most important is that of Mr. Cannon, who drew the deed, and also drew the wills.

Mr. Cannon says that he received instructions from Mr. Duvale to draw reciprocal wills. He thinks these instructions were contemporaneous with the closing of the title and the passing of the deed to the wife. His account is as follows:

" Mr. Duvale asked me what would be the effect of putting the title in Mrs. Duvale's name in case Mrs. Duvale died intestate. I told him that according to our laws (and I think I looked up the laws of New Jersey), in both instances they

Duvale v. Duvale.

never having had any children, it would go to the heirs-at-law of Mrs. Duvale. I said to Mr. Duvale that the only way I could see, if he placed entire confidence in his wife, between him and his wife, to make reciprocal, or, as we sometimes call it, counter-wills."

As already observed, Mr. Cannon had already said that he received instructions to draw such wills, he thinks, on the 12th of June, when the deed was made. Drafts of these wills were sent by mail to Mr. Duvale on the 28th of June. Mr. Cannon accounts for the sixteen days intervening between the date of the deed and the reception of the wills by Mr. Duvale, by saying that he first drew "what we termed drafts of the wills," and submitted them to Mr. Duvale, by sending them by one of their clerks or an office boy to Mr. Duvale's office. He thinks that the drafts came back to the office and that final drafts were sent by mail to Mr. Duvale on June 26th, as the charge for drawing them was made on that day. He says that he did not send the drafts immediately after receiving instructions to draw them, for that they were always behind in their office, in such matters.

The remaining testimony consists of subsequent admissions of the respective parties, concerning their understanding of the condition of the title to the property.

First in this line is the testimony of Edmund Moutenot, who is the only son of Mrs. Duvale by her first husband. It is conceded that in the agreement made between the husband and wife respecting the wills, at whatever period that agreement was made, it was understood that her will was to contain a legacy in favor of her son of $100.

Mr. Duvale says that after the execution of the wills he told Mrs. Duvale that she should inform her son that she had made such a will, so that he would not contest it after her decease. Moutenot swears that sometime between September 15th and October 15th, 1890, his mother came to his house near Belvidere, New Jersey, and she then and there said she had come to tell him what arrangement had been made between Mr. Duvale and herself in regard to this property. She said that the title was put in her name and that it was understood that she was to return those deeds if Mr. Duvale should ask for them for any

reason.  Then she spoke about the will; she admitted leaving everything to Mr. Duvale except $100, which was left to him; in case anything should happen she did not wish him to bother the will.  Moutenot also says that he was at the Duvales' house in March, 1893, about the time the will was destroyed.  He says that he heard Mr. Duvale say to his wife, " I would like to get the papers of my property back."  She replied, " I will make a new will."  He said, " You can give me a will to-day and make another to-morrow, and what I want is my title to the property back."  She said he should have it.

Now, although Moutenot and his mother are estranged, I am convinced that his testimony is as correct as a restatement of a conversation usually is.  Of more importance than the testimony of Moutenot is that of Dr. Du Plasse.  He says he was the physician of Mrs. Duvale as well as the friend of both.  He says that Mrs. Duvale was talking to him and his wife, in his dining-room, sometime in 1892.  She was complaining of her husband, and she said, " I don't know what to do with my money."  Dr. Du Plasse said, " Make my little girl your heir; give her your house and she will be satisfied."  Mrs. Duvale answered, " I cannot dispose of my house because it has been put in my name under conditions that I make my will in favor of Mr. Duvale."

In the other testimony I find little of significance in respect to the question at issue.

In an affidavit to a bill filed to enjoin a railroad company from going through this property, and in the testimony delivered on the trial in the condemnation proceedings brought by the same railroad, Mr. Duvale stated that Mrs. Duvale was the owner of the property.  But the statements do not seem to be of much value.  She did hold the legal title, and for the purpose which was in the mind of Mr. Duvale at the time, the language meant no more.  Nor is the testimony of Mrs. Lewis and her son-in-law, that Mr. Duvale, at the time his wife left, said that he had given her the house and she had left it to strangers; nor of Mr. Parmalee, that he (Duvale) said that he had given the house to her to make her quiet and contented, if possible;

Duvale *v.* Duvale.

nor of Rosalie Lehner, to the same effect, to my mind, significant, for when he said he had given her the property it was true that he had given it to her so long as she could herself enjoy it. On the other hand, I think Mr. Hamilton is mistaken when he says that Mrs. Duvale went before the commissioners in the condemnation proceedings already mentioned and spoke of this property as her husband's property, which had been put in her name. And I find little significance in the testimony of Mr. Bernadou, who was procured by Mr. Duvale to make the purchase for him of the second lot, when he says that at the time of that purchase Mr. Duvale told him that he wanted the deed made to Celine M. Duvale, remarking, "she holds my home in her name."

From this statement of facts, colored as they are by the general complexion of the testimony, I have arrived at the conclusion that Mr. Duvale, when he directed the deed of the first lot to be made to his wife, intended that in case he survived her the property should be his.

If it be a fact that, at or preceding the time when the conveyance of the first lot to Mrs. Duvale was executed, a conversation was held between Mr. Cannon and Mr. Duvale, as detailed in Mr. Cannon's testimony, it conclusively appears that Mr. Duvale, at the time of the execution of the deed to his wife, intended to reserve the legal title in himself after her death.

I think that it is true that she, after he had contracted for the property, persuaded him to put it in her name; that she used, in her conversations with her husband, the arguments and promises which he attributes to her; that with this in mind Mr. Duvale had his talk with Mr. Cannon about the best method for carrying into effect his intention. Mr. Cannon suggested reciprocal wills. Then came the direction to draw the wills. The draft and execution of these wills were acts done in consummating the intention of Mr. Duvale in the method pointed out to him. Under these conditions a trust resulted to the husband.

If, however, the testimony should be regarded as insufficient to overcome the presumption of a settlement, how does the case stand in respect to the second ground, namely, that Mrs. Duvale,

for a consideration of value which has been performed, promised to make a will devising this property to her husband? She admits that they agreed to exchange wills. This, however, did not create a contract which became enforceable. The mutual agreement lacked consideration. The execution of one of the wills was not such a part performance of the agreement as will confer jurisdiction upon a court of equity to decree the execution of the other. By the execution of the will, nothing was parted with by the testator or received by the named beneficiary. It was an act which became operative only in the event of death, if still unrevoked. By the existence of the absolute power of revocation until the occurrence of death, its execution was not detrimental to the one nor beneficial to the other during the life of the testator. But if the promise of the wife to make a will of this particular property was based upon a valuable consideration, then a court of equity will see that the promisee loses nothing by a breach of the contract. If a contract is to pay for services or for property by devise or bequest, an action will lie for the value of the services or the property, in default of the promised testamentary compensation. *Ridgeway* v. *English, 2 Zab. 423; Smith's Executors* v. *Smith, 4 Dutch. 208; Updike* v. *Tenbroeck, 3 Vr. 105; Stone* v. *Todd, 20 Vr. 275.*

If there is a promise to devise or bequeath specific property for services or for property, a court of law will allow an action to recover upon a *quantum meruit*, and a court of equity, where the contract is clearly proven, will, in its discretion, decree what is equivalent to a specific performance of the contract. *22 Am. & Eng. Encyl. L. 974; Waterm. Spec. Perf. ¶ 41.*

Nor will the fact that the agreement rests in parol debar a court of equity from exerting its power in this way if there has been part performance. The leading case in this country upon this subject is *Johnson* v. *Hubbell, 2 Stock. 332*, decided by Chancellor Williamson in 1855. A married woman died, leaving a large estate and two children, a son and a daughter. In the then existing condition of the law the son inherited two-thirds and the daughter one-third of the mother's estate. The father, who was tenant by the curtesy, persuaded the son to

equally share the mother's property with the daughter, by telling him that if he did not do so he, the father, would leave all his property to the daughter; but that if the son made an equal division of the mother's property, he, the father, would leave his own property equally between the two children. The son, induced by these representations, executed the necessary deeds to accomplish an equal division. When the father died it was found that instead of leaving his property as he had promised, he had cut off the son entirely. A large portion he devised to his daughter, who had been cognizant of the inducements which led to the partition, and had participated in carrying out the arrangement for a division of her mother's property. It was held that the contract between father and son was valid, and, although resting in parol, it having been performed by the son, and the contract being definite and certain, it was decreed to be specifically carried out.

The reasoning of the chancellor in *Johnson* v. *Hubbell*, was adopted as the ground of decision by the court of appeals of New York in *Parsell* v. *Stryker, 41 N. Y. 480.*

The principle so decided was recognized and applied by this court in the subsequent cases of *Van Dwyne* v. *Vreeland, 1 Beas. 142; Davison* v. *Davison, 2 Beas. 252; Pfluger* v. *Pultz, 16 Stew. Eq. 440.*

Whatever may be thought of the policy which permits a person to irrevocably direct the disposition of his property after his death, without putting his intentions in the shape required by the statute of wills, it cannot be questioned that instances of glaringly fraudulent conduct in obtaining services or property by the inducement of such unfulfilled promises, have led to a series of decisions in England and in this country, in which courts have taken hold of and remedied such instances of fraud, by seizing the property of the promisor and by devoting it to the relief of the defrauded party. The note of Mr. Freeman to the case of *Johnson* v. *Hubbell*, as reported in *66 Am. Dec. 773,* contains a large collection of cases in which this doctrine has been asserted.

It is proved to my satisfaction that Mr. Duvale spoke to his

wife about the execution of the wills, if not at the time, soon after the deed of the first lot to her was executed. The execution of the will was delayed from June 28th, when he received it, until August 20th, 1890. He says that she had an antipathy to signing a will, thinking that the fact of its execution would injure her health.

He had begun the improvements which were subsequently placed upon the property. He says that he requested her to execute the will, that she delayed doing so, and that he finally told her that if she did not do so he would discharge the men and cease work upon the place; that he did discharge the men; that then she signed the will, and the work was resumed. This testimony impresses me as natural and veracious. The case then stands thus: She understood that she was to make a will not merely in consideration that he would make a will in her favor, but also in consideration that he was to add to the value of the property by improvements, the cost of which would amount to many times the cost of the lot itself. Upon the faith of her promise to do so and of her having done so, he proceeded to carry out his intention in the lavish spirit displayed by the testimony. In my judgment, she promised to make a will in his favor, including this property, upon a valuable consideration which he has performed, and that her promise should be specifically performed. The property included in the agreement covered all accessions to the original lot. When Duvale purchased the additional adjoining lots and added them to the first plot, and built within and improved the whole, all became subject to the terms of the agreement.

But in what shape should the decree be framed? I do not think the decree will substantially differ whether it be drawn upon the theory that there was a resulting trust, or upon the notion that there was a promise to make a will. While it is true that a promise to make a certain will is not broken until the death of the promisor, and it is true that actions in which such promises have been enforced have been in cases occurring after the death of the promisor, yet I do not see why the court cannot, upon the principle of *quia timet*, fix upon the property a

liability to answer the promise, in any case where the promisor has, during life, repudiated its terms and attempted to make other disposition of the property. This Mrs. Duvale has done, and now, by her answer, claims the absolute right to do.

Chancellor Williamson recognized the right of the promisee to protection, upon the principle of *quia timet*, in the case of *Van Duyne* v. *Vreeland, supra.* Vreeland and his wife had adopted a child under a promise that all the property they had should, at his death, go to the child. Before his death Vreeland sold the property, for the purpose of cutting out the right of the adopted child, to a purchaser who had notice of such right. Although the complainant in that case, under the agreement, had no right to the property until the death of Vreeland, yet the chancellor decreed that the purchaser held the property subject to the agreement between Vreeland and his adopted son, and that upon the death of Vreeland, and after the accounting, the purchaser should convey the property to the complainant.

I will advise a decree that the defendant holds her title to the property in suit subject to the trust mentioned, as well as subject to her agreement to make a will for it in favor of the complainant; also, that she be enjoined, while the complainant is living, from making a will devising the property to any person other than the complainant, and that in the event of her dying during the life of her husband, her heirs-at-law shall at once execute a conveyance of the said property to the complainant.