CLEMENT C. CLAWSON

*v.*

AURELIA LEE BREWER et al.

[Filed June 28th, 1904.]

1. Where a father and son owned property together, which was largely acquired through the business ability of the son and direct applications of his money, the legal title to the property being taken in the name of the father, on condition that at his death it should be left by will to the son, but was in fact left by will to the son's stepmother, an agreement between the stepmother and the son that at her death, in consideration of the son making no claim against his father's estate, she would leave the property to the son by will, constituted a family arrangement or compromise, which, being founded on sufficient consideration and afterward acted on in good faith, will be enforced, though resting in parol.

2. The abandonment of any claim by the son against his father's estate, and the enjoyment by the stepmother during her life of the use of the property, constituted a valid consideration for the contract between the stepmother and stepson.

3. Where an agreement was entered into between a stepmother and stepson that, in consideration of his abandonment of any claim against his father's estate, she would leave certain property to him by will at her death, which was acquiesced in by both until her death, but not complied with by her, so that it would be impossible to restore him to the situation existing at the time of his father's death, an action at law for damages against the stepmother's estate would not afford an adequate remedy, and specific performance will be decreed in order to prevent a fraud.

4. In a suit against a decedent's estate to enforce specific performance of an oral agreement to devise land to complainant, in which decedent's executors are parties, complainant's testimony as to transactions with decedent, is inadmissible, under *P. L. of 1900 p. 363 § 4* relating to evidence; but the agreement being based on a promise of the deceased father of complainant to leave the property to the son by will, which he failed to do, complainant's testimony as to transactions with his father is admissible, the father's executors not being parties to the suit.

5. Where an oral agreement between decedent and complainant to devise land distinctly related to the property received by the decedent from her husband's will, the contract is not too vague and indefinite to be enforced, on the ground that the property was not described.

On bill, answer, replication and proofs.

*Mr. Charles H. Halfpenny* and *Mr. Robert H. McCarter,* for the complainant.

*Mr. Thomas S. Henry, Mr. Massey* and *Mr. Ingram,* for the defendants.

EMERY, V. C.

This is a bill filed by the complainant against the executors and devisees of his father's widow, complainant's stepmother, for the specific performance of a parol agreement to devise to him, at her death, the property she received from her husband's estate, on his death, by his will. The complainant's father, Henry T. Clawson, at the time of his death, August 12th, 1897, held the title to his dwelling-house, on Halsey street, in the city of Newark, and to a factory property on Hackett street, and had, besides, the title to personal property (mainly tools, &c., in the factory), worth about $10,000. Complainant had, from his own money, paid about one-half of the entire purchase-money on the Halsey street property ($6,500), and had paid in the same way about $3,000 toward the purchase of the factory property. At the time of the purchase, March, 1899, the factory was occupied under a lease to both father and son, which had still four years to run. The complainant lived with his father and stepmother from the time they all came to Newark together, and managed or superintended the work at the factory, which was the manufacture of machines, invented by complainant, for sale principally to companies which complainant controlled. It was mainly through these inventions by complainant, and through complainant's management of the business of manufacture and sale, and his control of the prices for both manufacture and sale, that the property of the son and that which stood in the name of the father was accumulated. A company called the Clawson Slot-Machine Company, which was organized by complainant about 1890 and controlled by him, purchased the machines from H. T. Clawson, at a price practically fixed by

complainant, and it was from the profits derived from this manufacture and sale to the company that the money paid by H. T. Clawson personally for the property in question was mainly derived. The complainant claims that the title to both the properties was taken and allowed to stand in the father's name under an express agreement between the father and himself, he being his father's only child, that whatever was made in the business they would enjoy together as long as they both lived, and that if the father should die he would leave all he had made to the son. The agreement, as he swears, was first made on the occasion of the purchase of the factory property, and taking the title in the father's name. The purchase price of the factory was $9,400, of which $8,000 was raised by a building loan mortgage. In February, 1895, the complainant, from his own funds, paid off the balance ($2,991) due on the purchase-money mortgage, and says that at the time of this payment the understanding about the property coming to the son after the father's death was again referred to and confirmed. On the purchase, in June, 1892, of the Halsey street property, the family residence which they had occupied under a lease to the father, the son advanced $3,200 for its purchase from his own money, and according to the son's statement the title was taken in the father's name on his giving the same assurance that when he was gone all would be the son's. That the talent and services of his son was the principal source of the property in question and of the means accumulated by the father is, I think, satisfactorily proved, as is also his acknowledgment of his son's affection and liberality and services in relation to his own property. It is also shown, by the evidence of Mr. Pierce, that in the conversation relating to his estate, taking place when he applied to him to be one of his executors, or spoke to him of the disposition of his estate, the father then intended that his wife should be taken care of during her lifetime, and that the property should go to his son at her death. From the evidence of conversations by the son with Mrs. Clawson after her husband's death, and another conversation with her by a witness, Miss Sweeney, and slightly corroborative, it would seem prob-

able that the father did make a will in favor of the son, which was superseded by a later will. The terms of any such will have, however, not been proved by competent evidence. By his will, dated August 15th, 1893, the father devised both the residence and factory in fee to his wife, complainant's stepmother, with the direction that his son, if he chose to do so, should be permitted to occupy the factory, with the implements, machinery and tools, at a rent to be fixed by his wife and executors, who were the wife and the son and an intimate friend, Amos W. Pierce. And after bequeathing to his wife and son equally the proceeds of his life insurance policy, and to his son $2,000, the testator devised and bequeathed all the residue of his estate to his wife. Immediately after the reading of the will complainant expressed, both to Mrs. Clawson and to Mr. Pierce, his dissatisfaction with it, and threatened to contest this distribution of his father's property. Mrs. Clawson herself spoke to Mr. Pierce of the complainant's opposition to the will and of his threats, and requested him to talk to the complainant and try to satisfy him that there was no necessity for him to contest his father's will or make a fuss. Mr. Pierce then said to her that complainant was dissatisfied because his father had not done right, or as he had agreed to do, and that his father had certainly agreed to leave him this property. Mrs. Clawson then said that she would carry out his father's agreements; that complainant should have this property; it should never go to her kin folks, but to him, and that she would make a will and leave it to him. Mr. Pierce said that if she agreed to do that complainant might be satisfied, and at Mrs. Clawson's request Mr. Pierce at once saw complainant for the purpose of giving him this assurance, and did communicate it to the complainant, advising him to accept it. The complainant said to Mr. Pierce that if his mother agreed to leave the property to him he would be satisfied, and this result of his conference was communicated to Mrs. Clawson, who thereupon said that she agreed to leave the property to her stepson, and this agreement was reported by Mr. Pierce to the complainant on the same day. No objection was made to the probate of the will, or to the disposition

of the property under it, according to its terms. The complainant put in no claim against the estate of his father for money advanced for the purchase of the property or for the running expenses of the factory, which he advanced for a time, or for the amount which was due on a claim for royalties on the manufacture of one of complainant's inventions, which was made by the father under a special agreement for royalties. No accurate account had been kept of the number manufactured, and the amount of this claim, alleged to be between $7,000 and $10,000, was uncertain. Complainant continued the business at the factory, and on January 1st, 1898, a lease for ten years, to May 1st, 1908, at the yearly rent of $1,200, was made by the executors to the Clawson Machine Company, the name assumed by the Clawson Slot Machine Company after the father's death. At the father's death complainant owned all of the stock except $4,000, which stood in his father's name, and which was procured by the father through the son by the sale to the company of machines at a price fixed by the son, which included the profit of manufacture. In March, 1898, Mrs. Clawson made a will, and Mr. Pierce says that she told him about that time that she had made the will leaving the property to Clement, and that she hoped he and all the rest would be satisfied. This will has not been produced, nor have its contents been otherwise proved, the counsel who drew it (one of the counsel for some of the defendants in this suit) declining to testify on the ground of professional privilege, and the disclosure was not further insisted on. The complainant, after the making of this will, together with his wife and child, lived with his stepmother and her niece, Miss Lee, now Mrs. Brewer, in the Halsey street house, or at a residence in the country belonging to complainant, at Flagtown, to which complainant removed shortly before the death of his wife. The relations between all the family continued affectionate and friendly during this time and up to the time of the death of complainant's wife, in 1900. A girl, named Ella Hood, had been employed as the nurse of his child, and lived with the family at the time of the complainant's first wife's death, and after this time there was

an estrangement between complainant and his stepmother on account of Miss Hood.

On July 17th, 1900, Mrs. Clawson made a second will, the one now in question, in the contemplation that complainant might marry Miss Hood, to which marriage she was opposed. This will, which contains some minor personal specific bequests, gives to her stepson the use of the Halsey street residence for his life on condition that he provide a home for her niece, Miss Lee, and on the further condition that he does not marry or live with Ella Hood. The use for his life of all the residue of her estate is also given to complainant upon condition that he does not live with or marry Ella Hood. The remainder in the estate after complainant's death (or on breach of the condition) is devised and bequeathed to the defendants, who are the nephews and nieces of Mrs. Clawson. It does not appear that Mrs. Clawson ever communicated to complainant her intention of changing her will, or of making her devise of the property subject to a condition of this kind, and, apparently without knowing of any such proposed condition, the complainant, in February, 1901, married Miss Hood. After this marriage complainant and his wife lived at Flagtown, and the friendly relations between complainant and his stepmother were interrupted, but he visited her at the residence in Newark, and before her death in February, 1902, the relations became more friendly. It does not appear that the complainant knew before the publication of this will that his interest in the estate received by Mrs. Clawson from his father had been made subject to this condition relating to his marriage.

The facts proved bring the case within the application of the equitable rules relating to specific performance of contracts in the nature of family arrangements or compromises. Such family arrangements changing the legal rights of the parties interested in the estate of a decedent, founded on sufficient consideration, and afterward acted on in good faith and partially performed, will be enforced, although made by parol and in the absence of a formal contract. *Williams* v. *Williams, 2 Eng. Ch. App. 294; Neale* v. *Neale, 1 Keen 672 (Lord Langdale, Master of*

*Rolls, 1837*) ; *Fry Spec. Perf. (4th ed.)* § *391; 12 Am. & Eng. Encycl. L. (2d ed.) 878; Hyde* v. *White,'5 Sim. 524 (Vice-Chancellor Shadwell, 1832).* This equitable policy of enforcing the performance of contracts to devise property, which are entered into on the basis of family arrangements and carried out upon one side, is recognized in the leading case of *Johnson* v. *Hubbell, 10 N. J. Eq.* (*2 Stock.*) *332, 339 (Chancellor Williamson, 1855).* The abandonment by complainant of any claim against his father's estate, arising by reason of the will, and the enjoyment by his mother, during her life, of the use of all the property received under her husband's will, constitute a sufficient consideration for contract to devise the property to her stepson. This acquiescence of both parties in the agreement until the death of Mrs. Clawson has placed the complainant in a position where it would be impossible to restore him to the situation existing at the time of his father's death, and an action at law for damages against the estate of his mother, if it could be maintained, would not afford an adequate remedy. The specific performance of the agreement to devise the property is therefore the only adequate remedy, and under these circumstances it should be enforced, although not made in writing. In many cases in our own courts parol agreements to devise property in consideration of services rendered, or other valuable consideration subsequently given, have been specifically enforced, on the ground that the remedy at law would be inadequate, and that such enforcement is necessary in order to prevent fraud, a consideration which excludes the case from the operation of the statute of frauds. *Johnson* v. *Hubbell, supra; Vreeland* v. *Vreeland, 53 N. J. Eq.* (*8 Dick.*) *387 (Chancellor McGill, 1895),* and cases cited at *pp. 389, 390; Duvale* v. *Duvale, 54 N. J. Eq.* (*9 Dick.*) *581, 588 (Vice-Chancellor Reed, 1896)* ; affirmed on this point on appeal, *56 N. J. Eq.* (*11 Dick.*) *375, 385 (1897).* In several cases the element of family arrangement or settlement was also to some extent involved in the rendition of the services and was relied on as a reason for specific performance. *Johnson* v. *Hubbell, supra, p. 339; Van Dyne* v. *Vreeland, 11 N. J.'Eq.* (*3 Stock.*) *370 (1857)* ; *S. C., 12 N. J. Eq.* (*1 Beas.*) *142 (Chancellor Wil-*

*liamson, 1858)*; *Schult* v. *Missionary Society, 41 N. J. Eq. (14 Stew.) 115 (Chancellor Runyon, 1886)*; *Vreeland* v. *Vreeland, supra; Kastell* v. *Hillman, 53 N. J. Eq. (8 Dick.) 49 (Vice-Chancellor Pitney, 1894).*

In reaching the conclusion that the contract to devise the property was made by the testatrix, I have not relied on the evidence of the complainant as to his transactions with her. Her executors are parties to the suit, and they are necessary parties. *Kempton* v. *Bartine, 60 N. J. Eq. (15 Dick.) 411 (Court of Errors and Appeals, 1899).* Complainant's evidence as to transactions with Mrs. Clawson is therefore inadmissible under the statute relating to evidence. *P. L. of 1900 p. 363 § 4.* His evidence is competent, however, as to the transactions with his father. The executors of the latter are not parties to the suit, nor do any of the defendants represent him in any capacity. Complainant's evidence as to the dealings and arrangements between his father and himself is corroborated by the evidence of disinterested and credible witnesses, and a situation has been satisfactorily shown which entitled him to claim a different distribution of his father's estate from that made by his will. This claim was honestly made, and the compromise of it by allowing substantially the entire estate left by the father to be enjoyed by the widow during her life, under her title derived from the will, on the agreement that the property should then be devised to complainant by her will, was a sufficient consideration for her agreement to devise, and Mrs. Clawson, having received on her part the full benefit of the consideration, was equitably bound to performance on her part. *Rue* v. *Meirs, 43 N. J. Eq. (16 Stew.) 377, 380 (Vice-Chancellor Van Fleet, 1887).* In claims of this character the proof should be clear and conclusive, but I think the proof in this case satisfies the standard required. A fact strongly relied on by defendants to raise doubts as to the existence of the alleged contract to devise is the proof that after Mrs. Clawson's death the complainant apparently, without objection, continued to pay the rent under the lease of the factory, made by the executors of his father, including himself, and in his letters to the devisees recognized their right to

the rents and made offers to purchase the factory; all without reference to the agreement. The lease, however, was not made to the complainant personally but to the Clawson Machine Company, and as between this company and the executors or devisees of Mrs. Clawson there could be no question as to the continued liability of the company for the payment of rent. And as to these payments of rent and the offers to purchase it is also to be considered that complainant, at the time of writing these letters, may not have been advised of his rights under the contract, and was minded to accept the situation as made by his stepmother's will. These payments and offers, however, would not justify any finding of waiver of his rights under the contract, or estoppel against its enforcement. They are matters which bear upon his credibility, but the proof of the contract depends on other evidence than that of the complainant. It was also objected that the contract was too indefinite and vague to be enforced, because the property to be devised was not defined. In terms, however, it distinctly related to the property received by her from her husband's will, and in *Johnson* v. *Hubbell, supra,* a contract of a similar general character was enforced. The *status* of Mr. Henry Clawson's personal estate seems to have been changed somewhat before Mrs. Clawson's death by her appropriation or use of some of it, with complainant's consent, as he was one of the executors, and as to this he is not entitled to any decree for accounting. Complainant's bill asks a decree for conveyance only of the factory and Halsey street properties, and at the hearing no further relief was insisted on. The decree for complainant will therefore extend only to these properties, together with the machinery, tools, &c., leased with the factory, and the stock of the Clawson Machine Company, if that was still retained by Mrs. Clawson at her death.