LUMAN W. LAWRENCE

*v.*

JUDSON C. PROSSER, executor, et al.

[Decided August 15th, 1917.]

1. Evidence *held* insufficient to show fraud in act of deceased in securing deed from her nephew of his interest in his uncle's estate.

2. Where the deed was given under an oral agreement to make a will providing for the grantor, and such will was made, and afterwards changed to his detriment, the contract was sufficiently specific to warrant equitable relief.

3. The fact that the agreement was completed at a later date does not prevent the consideration of the entire transaction as one contract.

4. The fact that such completion of the contract is to be accomplished by making a will, does not make the contract revocable.

5. On suit for an amount paid by the nephew in performance of this contract, he cannot both recover such amount and have a decree enforcing the contract.

On bill, &c.

*Mr. Scott German* and *Mr. Frank E. Bradner,* for the complainant.

*Mr. Hugh B. Reed* and *Mr. Theodore D. Gottlieb,* for the defendant, Prosser.

*Mr. Edward Q. Keasbey,* for the town of Bucksport.

STEVENS, V. C.

The complainant seeks to have a transfer of an interest in property, made by him to his aunt, Mrs. Dean, annulled, on the ground of fraud.

In April, 1911, Luman Warren, a resident of Bucksport, Maine, and an uncle of complainant, died intestate, leaving an estate, consisting of personalty and realty, valued at about

$60,000. His heirs and next of kin were a sister, Mrs. Dean, and three nephews, John, Stevens and Luman Lawrence. Mrs. Dean was entitled to one-half of his estate and his three nephews, each to one-sixth.

The complainant, Luman, who is about fifty-five years old, had up to March, 1905, lived with his brother John near Boston, but, as he says, being out of work, he, at his aunt's invitation, came to live with her in Newark. The family then consisted of Mr. Dean, who was engaged in the business of keeping a restaurant, and of Mrs. Dean. They had no servant and Luman, from the time he went there, took the place of one. He did everything that a maid of all work would ordinarily have done. His aunt's health was poor and she herself could do but little. He lived with her in this way up to the time of her death in June, 1916. Mr. Dean predeceased his wife by a few months. She is thus described by the Rev. Dr. Waters:

"She was domineering, shrewd. She impressed me as a woman in whom there was a struggle going on of unusual strength between the good and the evil in her. At times she was very quiet and of a very gracious personality, and other times she was extremely hard. On one occasion she ordered Luman out of my presence and her presence, as I don't think I would order a dog away from my premises. * * * There is an old England term that says she was very tight. She had an obsession, I think, as to money affairs. * * * It was her inordinate, well, greed, if I may so call it, that was the controlling impulse in the woman's life, with a certain intense hatred which she exhibited—which she either felt or assumed to feel toward her relatives."

Of Luman he says that he

"always impressed me as extremely docile, obedient; as a person who had subordinated his own mind and will to the direction and control of Mrs. Dean."

This description of the two principal characters in the case is borne out by the evidence of the other witnesses.

Shortly after the death of Luman Warren, the uncle, at Bucksport, Mrs. Dean and her nephew went there and conferred with Mr. Smith, an attorney, who subsequently became the administrator. A dispute at once arose, as to the administration, between Mrs. Dean and her Massachusetts nephews, which

produced a bitter feeling between them.   Mrs. Dean wanted what she regarded as a controlling interest in the estate and proposed to Luman that he assign his one-sixth interest to her. She did this for two reasons, first, to secure control and second, to protect Luman against his brothers, who, as she thought, rightly or wrongly, would, if they had the opportunity, play upon Luman's easy going disposition and strip him of his property. Mr. Smith, who is an intelligent and disinterested witness, says:

"I can recall that he (Luman) denounced his brothers in unmeasured terms and Mrs. Dean was equally as bitter against them as Luman was at the time.   *   *   *   She (Mrs. Dean) stated that she was afraid that if his brothers, Stevens and John, got his share of the Luman Warren estate into their hands, they would turn him out; cast him adrift upon the world.   *   *   *   She stated to me (his evidence shows that the statement was made in Luman's hearing and was approved by Luman) that he was possessed of certain infirmities and that his brothers had turned him out and he went on there (to Newark) and she took him in and made a home for him, provided for him, and intended to provide for him as long as he lived and make ample provision for him in her will."

Mr. Smith drew a deed from Luman to his aunt, by which he conveyed to her his undivided sixth interest in the land and personal estate derived from his uncle.   This deed was executed at Newark on August 2d, 1911.   I have no doubt whatever, notwithstanding Luman's present denial, that he understood the purport and object of it and that he agreed to it on the faith of his aunt's promise to "provide for him at her home as long as she lived" and amply to provide for him by her will "after she was dead and gone."

Mr. Smith's statement of the bargain is corroborated by Mrs. Dean's letters and acts; by witnesses in the best position to remember; and, in the end, by Luman himself.

On May 2d, 1913, she and Luman executed mutual wills. He gave his property to her and she, by a codicil to a former will, after giving her husband (who, as I have said, predeceased her) a life interest, devised and bequeathed her estate to Dr. George W. Clement, of Boston, in trust to invest and pay the income periodically to Luman during his natural life and at

his death to purchase the necessary land and erect thereon a suitable building to be used as a public hall for the inhabitants of Bucksport. Shortly before, under date of April 20th, 1913, she had written to Dr. Clement, telling him that words could not express her gratitude toward him for expressing his willingness to act

"when the time comes; *for it is my duty to provide and protect my* sister's son. .* * * Luman's inheritance from his uncle will be in the neighborhood of $14,000."

She apparently overrates the amount, the evidence indicating that it is from $10,000 to $12,000.

"Luman has *sold* to me all his claims and I shall *in return* give him all my property during his life, under guardianship, that he will be cared *for and not a prey to scheming friends."*

This letter appears to me to be conclusive evidence that Mrs. Dean did not regard the transfer in the light of a gift, but as the consideration for a binding promise on her part. To the Rev. Dr. Waters she spoke in the same strain.

"She informed me that she and Luman had exchanged wills. Luman had willed his property to her and she hers to him; that it was her purpose to see. that her property reverted to Luman when she passed away, *subject to restrictions;* she did not think that he was as capable as he might be, on account of his deafness or inexperience to take charge of the property and she was going to will it so that he would have the use of it subject to restrictions; she was afraid some sharp fellows might get the property away from Luman and she wanted him to have the benefit of it during his life."

On February 29th, 1916, she apparently, from mere caprice, revoked her disposition in Luman's favor and gave him, instead, a yearly income of $600 during his life.

Luman, when cross-examined at the close of the case, after denying that the deed of August 2d, 1911, was read to him before he signed it, testifies as follows:

"*Q.* But you knew when you signed it that you had signed a deed?

"*A.* Well, I knew, as you might say, that it was a paper for that purpose; * * * my aunt told me it was to sign that paper to hurry up the sale of the property and that is all that I knew.

"*Q.* She (Mrs. Dean) said it was a deed, didn't she?

"*A.* A deed or a paper; whatever you might call it.

"*Q.* And you knew, as a matter of fact, it was a deed?

"*A.* I wouldn't say as a matter of fact that I knew it was a deed; but I knew she said it was a paper where that would be done to hurry up the settlement of the property; I didn't know that I was throwing my stuff away. ❋ ❋ ❋

"*Q.* You never questioned the validity of that act until you filed your bill (Aug. 22, 1916)?

"*A.* Never did question it; didn't know anything about it. ❋ ❋ ❋

"*Q.* Didn't you know, as a matter of fact, that your aunt had provided for you after her death?

"*A.* Why—after her death—why yes; *I saw what it said in the will;* that is all I see; all I knew.

"*Q.* And was that satisfactory to you?

"*A.* Good God; no, it wasn't.

"*Q.* When did this dissatisfaction on your part first manifest itself?

"*A.* When did it? Why, the first time I knew it was said in the will. [The witness is here evidently referring to the second will, which cut him down to an income of $600 a year.]

"*Q.* What had you expected?

"*A.* I expected I had the whole dam thing.

"*Q.* What led you to that expectation?

"*A.* That was because the—according to this will that she and I made; by golly, that was what it was.

"*Q.* Well, then, you did expect that she had made provision for you; only you expected a better provision than manifested itself; isn't that so?'

"*A. Well, that might be so*—and another thing—according to that will there, what she drew—I drew in her favor and my favor, I was to have the whole thing; *that is what I supposed I done.*

"*Q.* And was that your agreement with her, that you were to have the whole thing?

"*A. That was the agreement, right straight down,* when that will was made out."

The two wills of May 2d, 1913, were drawn by Judge Raymond. Mrs. Dean and her nephew went to his office together and it is perfectly obvious that their contents were known to both and satisfactory to both. The will of Mrs. Dean was evidently intended to be in fulfillment of her promise made in Mr. Smith's presence, in the summer of 1911, that, in consideration of the transfer of Luman's interest in his uncle's estate, she would amply provide for him.

And the bequest in the will of 1913 was an ample provision. It would, in the events that happened, have given him a clear yearly income of over $2,000—much more than an equivalent

for the interest he had turned over. The bequest in the will of 1916 was not an ample provision.

What induced Mrs. Dean to change her will just before she died does not appear. Luman continued to be her faithful servitor up to her death. It is true that between the time of the making of the mutual wills and her death, her estate had been augmented $20,000 or thereabout by what her husband had left her, but even without this addition Luman would have received three times as much as she finally gave him.

The complainant has put in evidence letters showing that Mrs. Dean was trying to conceal from her Massachusetts relatives the true character of the transfer and he has produced witnesses who speak of her casual declarations to the effect that Luman's interest had been turned over "for her to take care of." These do not, as it seems to me, throw any additional light upon the case. The transaction stated in its simplest form was obviously this: Mrs. Dean wanted to control as much of her brother's estate as she could and she wanted to protect Luman against himself; to protect him in the way that *she* thought best. In point of fact, up to within three months of her death, her plan to provide for him was greatly for his interest. He had no one dependent upon him, was not likely to marry and would be better off with a large income, than a small principal. During the period between August, 1911, and February 29th, 1916—the date of the making of the last will— there is no evidence that she had the slightest intention of perpetrating a fraud upon him. The equivalent she intended to give was more than equal in money value to what she had received. The injustice that he had suffered, if it be an injustice, arises from the change in his aunt's provision for him. On these facts it seems quite impossible to find that the deed was fraudulently obtained.

It is argued that the court should annul the transfer on the principle of *Slack* v. *Rees*, 66 *N. J. Eq.* 447. This and similar cases do not apply, for the reason that this is not a case of an improvident gift but of a contract which, in terms, stipulated for a full equivalent. Luman was to be *amply* provided for. While he was no doubt weak and yielding and his aunt, im-

perious, there is not the slightest evidence that he did not possess sufficient capacity to make a bargain with her.

This brings me to the question whether this court can give relief and what that relief ought to be. The question is not whether the wills of May 2d, 1913, are binding because executed on the same day and parts of one transaction, but whether Mrs. Dean's will, made in fulfillment of her promise and based on adequate consideration, is not binding upon her. The evidence justifies the inference that the provision was made in fulfillment of her promise and that it was accepted as such by the promisee. The executor and the town of Bucksport cite *Eggers* v. *Anderson, 63 N. J. Eq. 264,* as a controlling authority. As I understand the decision, Mr. Justice Dixon made a distinction between a promise, based on valuable consideration, to make a specific provision by will, and a promise merely to make a will; a promise induced by charitable acts of the promisee performed and to be performed; acts which the promisee had done and contemplated doing but without legal obligation resting upon her to continue them. He concedes that a promise to make a specific provision by will, supported by consideration, may be binding; and such is the current of authority.

Schouler, in his book on Wills and Administrations, section 454, says that a court of equity will specifically enforce a contract to execute a will after a certain tenor, when the contract is founded upon valuable consideration. It does this by fastening a trust upon the estate of the deceased, not only where land is concerned but personalty as well. One of the earliest cases (*Dufour* v. *Perira, Dickens 420, A. D. 1769*) was a case of trust declared in respect of certain bequests. In a note to section 746 of *Pom. Eq. Jur.* the author quotes with approval what is said in *Bolman* v. *Overall, 80 Ala. 451.* The passage is entirely apposite to the present situation.

"All the authorities agree that one may for a valuable consideration renounce the absolute power to dispose of his estate at pleasure and bind himself by contract to dispose of his property by will to a particular person and that such contract may be enforced after his decease, either by an action against the personal representative or in a proper case by a bill in the nature of specific performance against his heirs, devisees or personal representatives."

This is the doctrine of *Johnson* v. *Hubbell, 10 N. J. Eq. 332,* a leading case on the subject. An action at law for breach of contract would, here, do violence to the intentions of both parties and would not do justice to either. The equitable remedy would effectuate the very trust intended. A promise, based on valuable consideration, to do a lawful act will, if broken, generally, if not always, give rise to some form of action. The only question will be whether the relief to be accorded shall be legal or equitable. I take it that if the promise made by A be, merely, amply to provide for B by will, B, if the promise be broken would have to sue at law for damages; but if the promise be to give a particular thing by will—at least such a thing as cannot be adequately compensated for by damages— and the statute of frauds do not prevent (*Maddison* v. *Alderson* (*1883*), *8 App. Cas. 467*) B may sue in equity. As a trust was intended—a trust that would be defeated, if damages were given—the question reduces itself to this: Was the contract sufficiently specific to warrant equitable relief? In the first instance, perhaps, it was not. As made just before the time of the transfer in August, 1911, it was, merely, "amply to provide." But when Luman made the transfer and when Mrs. Dean executed her will and specifically defined the ample provision, in terms satisfactory to both, the contract was completely executed on one side and completely defined on the other and could, therefore, only be varied by the consent of both. If she had made the will contemporaneously with the transfer of the property and because of the transfer it is clear under the authorities that a contractual obligation would have been imposed upon her. Because she waited awhile, the obligation all the time resting upon her to do the very thing which she did, it does not seem to me that the effect of the transaction, looked at as one whole, is different.

If it be argued that the agreement at the time of the transfer was not complete in all its parts—that the ample provision was not specifically defined—that after having once defined it, she might, within the limits of her contractual obligation, still redefine it, if she made it *ample,* the answer is that in view of her circumstances and of what she had received, the

second provision was not ample, and so the change was contrary to her obligation. But further, it must be remembered that Mrs. Dean is dead and complainant under a disability fully to testify. In view of the evidence, I think it a fair inference that the kind of provision was from the beginning understood between them and that the will did no more than embody the understanding in a writing. It would be too much to say that because the papers relating to the two parts of this transaction were executed at different times, we are to apply a rule different from that which would have governed, had they been executed at the same time. The different parts of a complex transaction are frequently reduced to writing at different times, but this does not prevent their being considered as one whole.

Again it is argued that because the provision was contained in an instrument in its nature revocable, it was subject to change at the will or caprice of the testatrix. The will was of course revocable, but the agreement to make the provision, being founded on valuable consideration, was not. It was the duty of testatrix to embody it in any will she thought fit to make.

There is an unfortunate complication. Luman sued the estate of Mr. Dean while this suit was progressing, and, by the verdict of a jury, recovered not only wages for services rendered in the Dean home, but also the amount of a check for $1,342, part of Luman Warren's estate, that under his nephew's deed of transfer passed to his aunt. The fact that it was handed over to Mr. Dean, it must be assumed with his wife's consent and as her agent, did not make it part of Mr. Dean's estate. If Luman therefore claims the money he to that extent endeavors to repudiate his transfer. He cannot have the consideration on which his aunt's agreement was based and at the same time claim the benefit of the trust constituted for his benefit. Counsel have not discussed this phase of the controversy and I will hear them on it.