The bill alleges that Robert Daley and Ellen Montgomery Daley were husband and wife; that prior to the 28th day of December, 1922, they agreed to make mutual wills, each devising *Page 658 
to the other all his or her property; that on December 28th, 1922, each made a will devising and bequeathing all property, real and personal, to the other; that the wills were handed to the said Ellen Montgomery Daley for safekeeping; that on the 4th day of September, 1924, the said Ellen Montgomery Daley died, and that diligent search has been made for said wills and that neither has been found; that no new will or revocation of the will executed by said Ellen Montgomery Daley has been discovered.
The defendants, Ghertine Ripperger Martin and Madaline Ripperger Fraser, are daughters of said Ellen Montgomery Daley, and that they claim to be entitled to the real and personal property of which the said Ellen Montgomery Daley died seized, there having been no children born of the marriage of Robert Daley and the said Ellen Montgomery Daley.
Upon petition alleging the said Ghertine Ripperger Martin to have been appointed administratrix of the estate of Ellen Montgomery Daley, she as administratrix of said estate was admitted as a party defendant, and has answered.
The prayer of the bill is:
"2. That a writ of injunction issue against the said defendant Ghertine Ripperger Martin, her servants and agents, commanding them to refrain and desist from selling or exposing to sale any of the goods and chattels herein mentioned and referred to.
"3. That complainant have such other and further relief as shall be equitable and just."
That after the death of Mrs. Daley, Daley, for the expressed consideration of one dollar in each, made two assignments to the complainant, one of the real estate and the other of the personal property of which the said Ellen Montgomery died seized.
The wills were drawn by William T. Leek, a scrivener, and executed by Mr. and Mrs. Daley in the presence of Leek and one Andrew P. Johnson.
Mr. Johnson testified that he was present at the execution of the wills; that Mr. Leek read the papers over, and that *Page 659 
"the substance of it was that in the event of Mr. Daley's death the property should go to Mrs. Daley — in the event of Mrs. Daley's death the property should go to Mr. Daley."
Mr. Leek testified that upon the instruction of Mr. and Mrs. Daley he drafted the wills in question, and that they were in due form, executed with himself as witness. That each will directed the payment of funeral expenses and just debts, and that Mrs. Daley was named as executor of Daley's will and he of hers.
Mrs. Howell's testimony as to the will was only that Mrs. Daley had told her she had made a will and everything was to be Bob's,c.
Vice-Chancellor Backes, in Tooker v. Vreeland, 92 N.J. Eq. 340
(on p. 342), said:
"The law is well settled, and the proposition is not questioned, that if Mr. and Mrs. Tooker made a compact to dispose of their combined estates, the terms of which find expression in the mutual wills, the contract will be enforced in equity according to its established practice. Equity will not interfere with the probate of the later will, made in violation of the contract, but will enforce the contract against the estate of the survivor by impressing a trust upon the assets. There is a wealth of authority for the relief and the remedy. Many of the cases are gathered by Vice-Chancellor Garrison in Deseumeur v. Rondel,76 N.J. Eq. 394. The early English cases are Dufour v.Pereira, 1 Dick. 419; 2 Harg. Jr. Arg. 304; Lord Walpole v.Lord Orford, 3 Ves. Jr. 402. See, also, for collection of casesStevens v. Myers, 91 Org. 114; 177 Pac. Rep. 37. An interesting discussion of the subject is to be found in Edson
v. Parsons, 155 N.Y. 555; see, also, Rastetter v.Hoenninger, 136 N.Y. Supp. 961; Herman v. Ludwig,174 N.Y. Supp. 469. An early case in this state on the subject of enforcing contracts to bequeath is Johnson v. Hubbell, 10 N.J. Eq. 332,
and the leading case is Duvale v. Duvale, 54 N.J. Eq. 581;56 N.J. Eq. 375; see, also, Lawrence v. Prosser,88 N.J. Eq. 43.
"That such a contract be enforceable it must be, like all other contracts specifically enforceable in equity, founded *Page 660 
upon a valid consideration, certain and defined, equal and fair and sufficiently proven — qualities to which Lord Loughborough said in Lord Walpole v. Lord Orford, supra, he knew no limitations.
"The mutual wills do not on their face purport to be contractual. Their reciprocal provisions indicate that they were the result of an understanding between Mr. and Mrs. Tooker, but an understanding does not necessarily spell contract. The vital question is, Was it agreed by them that the wills should remain irrevocable after the death of either? For the solution of this we must look to the extraneous testimony, keeping in mind that, to establish an agreement, the proofs must be clear and convincing. The contract may be found in an express promise, or inferred, as a conclusion of fact, from the circumstances surrounding the parties."
An examination of the testimony is convincing that the making of the mutual wills was the result of a contract between them.
James Daley, Jr., testifies that Mrs. Daley told him about the middle of January, 1923, "that her and Uncle Bob had made an agreement that upon the death of either one of them that if she died she was to will Uncle Bob her property and possessions, and if he died he was to leave her his property and possessions, and that is all I know of the case. At the time it didn't appear to me as anything important."
The testimony of Henry H. McAlees is that in the early spring of 1923 "Mrs. Daley, in the presence of Mr. Daley and myself, said that they, Mr. Daley and Mrs. Daley, had mutually made an agreement whereby at the time of death anything ever happened to them, automatically the wills would be transferred to one another, otherwise a mutual agreement between Mrs. and Mr. Daley."
Ella Adams, an ignorant colored maid, gave similar testimony that, in May, 1923, Mrs. Daley said: "The agreement was all fixed and she had made all her will to Mr. Daley what was left, what she had was made to Mr. Daley, anything *Page 661 
would happen to her, and if Mr. Daley would die, then she would get what was, you know, what was left for her."
This woman became very much confused upon cross-examination as to the date this statement was made to her, stating that it was in May, 1922. She at all times insisted, however, that the conversation was after the marriage of Mr. and Mrs. Daley (which took place June 8th, 1922).
John Gaither states that in January, 1923, Mrs. Daley said: "I told them that they would freeze to death down there, was cold in this house you know, only had a gas stove, and Mrs. Daley said: `Well, if we do, we have made our wills and made an agreement and made our wills, and we have agreed to give each other at the time of death all that we own.'" She said: "If I die first Mr. Daley gets all of mine, and if he dies first I get all that he owns."
Mr. Howells testified that Mrs. Daley told him that "we make [made] our wills out for each other and you ought to do the same."
Mrs. Baines testified that in September, 1923, "Mrs. Daley told me that she had no will, and that she hoped whatever she had Mr. Daley wouldn't ever have anything, that she hoped that her children would get what she had."
This was after the wills were executed, and can bear one of three interpretations:
1. That Mrs. Daley had destroyed previous thereto her will.
2. That Mrs. Daley was misleading Mrs. Baines; or
3. That Mrs. Baines is mistaken.
Neither interpretation materially assist in the determination of the question being considered.
Mrs. Wray's testimony is that, in 1924, Mrs. Daley said: "He is all the time nagging at me to make a will, and if it wasn't for some of the neighbors he would have killed me in the month of April. He had a lawyer, Reed, and some other witness" — I forget their names — "and because I wouldn't sign papers for him he beat me black and blue, but I screamed so loud some of the neighbors heard me and came to my rescue." *Page 662 
Her story cannot be accepted as true. The wills were made in 1922, and, manifestly, he could not be "nagging her about making a well."
This woman's testimony was not given in a convincing manner, and did not impress me as being a truthful statement.
Nellie Lockman testified that in 1922, directly after they were married, Mrs. Daley said: "Bob, don't bother me about making a will. I will never make no will way you mistreat me; how you figure I make a will to you."
If this testimony is true, Mrs. Daley evidently changed her mind, as the wills were made in December, 1922.
It is very evident that both Mr. and Mrs. Daley were accustomed to drinking to excess, that she was often under the influence of liquor, and that he was intoxicated, perhaps, to as great an extent.
It is also evident that the daughters, the present defendants, had little, if any, affection for their mother, and the present excuse that they were prevented by Daley from seeing their mother has little weight, as for several years prior to the mother's marriage to Daley they had made no attempt to see her, one living within a short distance from Atlantic City (in Philadelphia).
I am convinced that Mr. and Mrs. Daley made a contract to dispose of their combined estates, the terms of which were expressed in the mutual wills, and that the contract can and should be enforced.
Having so found, it is unnecessary to determine whether Mrs. Daley destroyed her will, or whether it was stolen from the place in which it was kept.
At the hearing I permitted the complainant as well as Daley to testify, but, quoting Vice-Chancellor Emery, in Clawson v.Brewer, 67 N.J. Eq. 201 (at p. 208): "In reaching the conclusion that the contract to devise the property was made by the testatrix, I have not relied on the evidence of the complainant as to his transactions with her. Her executors are parties to the suit, and they are necessary parties. *Page 663 Kempton v. Bartine (Court of Errors and Appeals, 1899),60 N.J. Eq. 411. Complainant's evidence as to transactions with Mrs. Clawson is therefore inadmissible under the statute relating to evidence." P.L. 1900 p. 363 § 4.
Without deciding whether Daley's testimony is or is not admissible, I excluded its consideration, as the assignment to the complainant was made without consideration, and it is quite probable his testimony should also be found inadmissible.
A decree will be advised in accordance with these conclusions.